## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-03609-NYW-TPO

PUEBLO VILLAGE ACQUISITION, LLC, AND
ENCINO ACQUISITION, LLC,

       Plaintiffs,

  v.

ASSET PLUS USA, LLC;
ASSET LIVING, LLC; AND
ALPHA BARNES REAL ESTATE SERVICES, LLC,

       Defendants.

---

### AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

---

Plaintiffs Pueblo Village Acquisition, LLC ("PV LLC") and Encino Acquisition, LLC ("Encino LLC") (collectively, "Plaintiffs"), by and through undersigned counsel, hereby allege against defendants Asset Plus USA, LLC ("Asset Plus"), Asset Living, LLC ("Asset Living"), and Alpha Barnes Real Estate Services, LLC ("Alpha Barnes") (collectively, "Defendants"), as follows:

### INTRODUCTION

1. Plaintiffs entered into property management agreements with Defendant Alpha Barnes to manage two affordable housing apartment complexes subject to regulations promulgated by the U.S. Department of Housing and Urban Development ("HUD") and Colorado Housing and Finance Authority ("CHFA"). These agreements required Defendants to

ensure the safe, compliant, and efficient operation of both properties, including unit maintenance, vendor oversight, rent collection, financial reporting, and preparation for regulatory inspections. HUD and CHFA compliance is not merely a contractual obligation—it is essential to protect residents' housing, maintain Section 8 contracts that provide critical affordable housing, and preserve Plaintiffs' legal authority to operate the properties.

2.    Defendants have systematically breached their contractual duties, creating an operational and regulatory crisis. They have refused to pay approved vendors for essential services, causing service suspensions that threaten property habitability, regulatory and lender compliance. Defendants initially misled Owner Allison Kunis by assuring her that management services would continue, only to later reassert wrongful termination notices—conduct that appears designed to create maximum disruption. Most critically, Defendants have withheld or provided incomplete and inaccurate financial and operational records, including accounts payable with supporting invoices, rent rolls, operating statements, tenant delinquency reports, collection records, and eviction status updates. This obstruction has crippled Plaintiffs' ability to oversee operations or transition to replacement management.

3.    Defendants' breaches have created an untenable situation that threatens the properties' continued viability. Without functioning management or accurate records, basic operations will ground to a halt: vendors cannot be paid, rent cannot be collected, supplies cannot be ordered, and units cannot be maintained. With a HUD inspection looming, there is imminent risk of severe sanctions, including potential termination of Section 8 contracts, if Defendants' obstructive conduct continues. Such sanctions would devastate both the properties'

financial stability and displace vulnerable residents. Any continued delay risks catastrophic consequences that could render the properties inoperable and financially ruined.

4.      Plaintiffs bring this action to compel Defendants' immediate compliance with their contractual obligations and to obtain the records and cooperation necessary for seamless transition to replacement management. The crisis Defendants have manufactured demands urgent judicial intervention to protect both the properties and the residents who depend on them for safe, affordable housing.

## THE PARTIES

5.      PV LLC is, and at all relevant times was, a limited liability company duly formed and existing under the laws of the State of Colorado. PV LLC is wholly owned by its sole member, Pueblo Village GP, LLC, a limited liability company duly formed and existing under the laws of the State of Colorado. Pueblo Village GP, LLC is wholly owned by its sole member, Allison H. Kunis ("Kunis"), who is a citizen of the State of New York.

6.      Encino LLC is, and at all relevant times was, a limited liability company duly formed and existing under the laws of the State of Colorado. Encino LLC is wholly owned by its sole member, Encino GP, LLC, a limited liability company duly formed and existing under the laws of the State of Colorado. Encino GP, LLC is wholly owned by its sole member, Kunis, who is a citizen of the State of New York.

7.      Plaintiffs are informed and believe, and on that basis allege that Asset Plus is a limited liability company organized under the laws of the state of Texas and having a principal place of business in Texas. Upon information and belief, Asset Plus is the parent company of Alpha Barnes and Asset Living and exercises operational and managerial control over both

entities. Ryan McGrath, who serves as CEO and President of Asset Living, is also listed as Manager and registered agent for Asset Plus and Alpha Barnes in the Texas Secretary of State records at the same principal address. This overlapping management demonstrates that Asset Plus exercises operational and strategic control over Alpha Barnes and Asset Living, including the conduct alleged herein.

8. Plaintiffs are informed and believe, and on that basis allege, that Asset Living is a limited liability company organized under the laws of the state of Texas and having a principal place of business in Texas. Asset Living is a property management company that engages in property management nationwide.

9. Plaintiffs are informed and believe, and on that basis allege, that Alpha Barnes is a limited liability company organized under the laws of the state of Texas and having a principal place of business located in Texas. Upon information and belief, Asset Living acquired Alpha Barnes prior to the execution of the management agreements at issue.

**JURISDICTION AND VENUE**

10. This Court has diversity jurisdiction over this action under 28 U.S.C.§ 1332. As alleged above, Kunis, a citizen of the State of New York, is the sole member of Pueblo Village GP, LLC, which in turn is the sole member of PV LLC. Kunis also is the sole member of Encino GP, LLC, which in turn is the sole member of Encino LLC. On information and belief, Asset Plus, Asset Living and Alpha Barnes are citizens of the State of Texas.

11. The amount in controversy exceeds $75,000, exclusive of interest and costs.

12. This Court also has federal question jurisdiction under 28 U.S.C.§ 1331 because resolution of Plaintiffs' claims necessarily requires the interpretation and application of federal

law governing the Section 8 Housing Assistance Payments ("HAP") program and related HUD

regulatory requirements. Several of the contractual breaches alleged in the Complaint turn on

Defendants' failure to comply with obligations imposed by federal statutes, HUD regulations and

HUD-mandated procedures incorporated into the Management Agreements, including

requirements governing tenant certifications, recertifications, inspection readiness, voucher

submissions, waiting lists, and maintenance of subsidized units. The parties' dispute over

whether Defendants have properly performed—or may lawfully cease performing—management

duties for federally subsidized properties cannot be adjudicated without determining the meaning

and application of federal housing law.

13.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a

substantial part of the events and omissions giving rise to the claims in this action, including the

actionable misrepresentations identified herein, occurred and were made in this district through

the subject properties, located in Pueblo, Colorado.

**FACTUAL ALLEGATIONS**

**A.    Plaintiffs' Affordable Housing Apartment Communities**

14.    Plaintiffs own two large multifamily residential communities in Pueblo, Colorado,

approximately 100 miles south of Denver. Specifically, PV LLC owns Pueblo Village

Apartments, a multifamily residential community consisting of 128 affordable housing units, and

Encino LLC owns Encino Apartments, a multifamily residential community consisting of 42

affordable housing units (collectively, the "Apartment Communities").

15.    As one of the largest steel-producing cities in the United States, the City of

Pueblo, Colorado plays an important economic role in the State of Colorado, and in the nation as

a whole. Nevertheless, the median annual income in Pueblo is substantially less than the average median annual income in the State of Colorado and in the United States. Recent news reports have ranked Pueblo as the poorest city in the State of Colorado. As a result, ready access to safe and secure affordable housing is critically important for the residents of Pueblo—a service that Plaintiffs are privileged to provide.

16.    Because they are affordable housing complexes, the Apartment Communities are subject to regulations promulgated by HUD and CHFA. Consequently, having a property management company that is both aware of and capable of complying with those regulations is imperative.

17.    Both properties operate under Section 8 Housing Assistance Program Payments contracts, which impose federally mandated compliance obligations on owners and management agents, including: (1) adherence to HUD NSPIRE inspection protocols, (2) maintenance of accurate tenant files and subsidy certifications, (3) timely completion of annual and interim recertifications, and (4) compliance with related regulations. These federal requirements define the operational structure within which the Management Agreements function.

18.    For both Apartment Communities, any property management agent is required to execute a Project Owner's/Management Agent's Certification. Attached Hereto as **Exhibits A and B** are a true and correct copy of the Certification for Pueblo Village Apartments and Encino Apartments, respectively. By signing this mandatory HUD form, the management agent agrees to comply with all obligations associated with the properties' Section 8 Housing Assistance Payment contracts. This includes an express commitment to "comply with HUD handbooks, notices or other policy directives that relate to the management of the project," and to ensure that

6

the properties are operated in accordance with federal program requirements, including

maintenance of habitability, proper certification and recertification of tenants, timely submission

of HAP vouchers, and adherence to all health, safety, and regulatory standards. These federal

obligations form part of the baseline duties assumed by Defendants under the Management

Agreements.

**B.        The Management Agreements and Duties**

19.        Plaintiffs agreed to retain Alpha Barnes as their management company in July

2023, executing separate management agreements with Alpha Barnes for each of the Apartment

Communities. Attached hereto as **Exhibit C** is a true and correct copy of the Management

Agreement for Pueblo Village Apartments between PV LLC and Alpha Barnes, dated July 31,

2023. Attached hereto as **Exhibit D** is a true and correct copy of the Management Agreement for

Encino Apartments between Encino LLC and Alpha Barnes, dated July 31, 2023. These

agreements, which are substantively identical, are referred to herein collectively as the

"Management Agreements" or "Agreements."

20.        At all relevant times, Alpha Barnes operated under the ownership and control of

Asset Living. In practice employees and representatives of Asset Living routinely acted and

communicated on behalf of Alpha Barnes in connection with the Apartment Communities. Asset

Living and Alpha Barnes held themselves out to Plaintiffs as a single, integrated enterprise

jointly responsibly for fulfilling the Management Agreements. Plaintiffs reasonably

understood—and Defendants consistently represented—that Asset Living's corporate

infrastructure, accounting systems, and personnel were directly involved in the day-to-day

management of the Apartment Communities.

21.    In exchange for Plaintiffs' payment of a monthly management fee and certain additional costs, the Agreements required Defendants to, among other things: (a) rent out units in the Apartment Communities; (b) collect rent and properly manage accounts receivable; (c) properly maintain the Apartment Communities; (d) pay vendors and maintain accounts payable records; (e) maintain compliance with HUD requirements; (f) adequately track and manage tenant occupancy and vacancies; and (g) provide timely and accurate reporting to Plaintiffs.

22.    Specifically, Section 2.1 of the Agreements mandated that Defendant would "perform leasing, management, and occupancy activities," such as, " (i) advertise the Project . . . (ii) cause references and credit history of prospective residents to be investigated, (iii) execute and deliver . . . Leases on apartment units or beds in the Project, (iv) renew and/or cancel existing Leases, and (v) collect and maintain security deposits deposited by residents."

23.    Section 2.3 of the Agreements required Defendants to "request, demand, collect, receive and receipt for all monthly rents, utility charges, parking charges, late payment charges, non-negotiable check charges and any other taxes or charges due from any resident of the Project."

24.    Section 2.4 of the Agreements required Defendants to "receive, consider and promptly act upon and record in systematic fashion maintenance and service requests of the Project residents."

25.    Section 2.6 of the Agreements required Defendants to "maintain or cause to be maintained . . . the buildings, equipment, personalty, landscaping and other improvements of the Project."

26.    Section 2.7 of the Agreements required Alpha Barnes to "hire such qualified on-site managerial and/or maintenance personnel."

27.    Section 2.8 of the Agreements required Defendants to "enter into contracts with qualified independent contractors for the furnishing of services, utilities, and concessions, such as water, electricity, gas, fuel, telephone, vermin extermination, heating and air conditioning maintenance and repairs, and other necessary or advisable services as determined in the reasonable discretion of Manager . . . Manager shall purchase or lease . . . any equipment, tools, appliances, materials and supplies as are necessary or advisable (as determined in the reasonable discretion of Manager) to operate the Project or perform any maintenance, repairs, replacements, structural alterations or capital improvements pursuant to this Agreement."

28.    Section 2.14 of the Agreements required Defendants to "comply with the applicable and relevant requirements of Housing and Urban Development ('HUD'), Colorado Housing and Finance Authority, Home Investment Partnership Act, Fannie Mae and any other government rules, regulations, or requirements applicable to the Project." Many of the duties at issue in this action—such as the obligation to maintain tenant certifications, prepare compliant vouchers, preserve HAP subsidy eligibility, and meet federal inspection standards—arise directly under federal law and federal regulatory programs.

29.    Section 3.2 of the Agreements required Defendants to deposit and disburse funds from an operating account established solely for each property.

30.    Section 3.5 of the Agreement required Defendants to ,"[n]o later than the fifteenth (15th) day of each month[,] . . . provide (via email in any reasonable format mutually agreed to by the parties) to Owner or to whomever Owner shall reasonably designate: (i) detailed

statements of receipts and disbursements; (ii) aging of accounts receivable and payable (30, 60, 90 days and beyond 90 days); (iii) a detailed monthly and year to date comparison of income and expense to the Operating Budget; rent roll, occupancy report, general ledger, balance sheet; (iv) bank statements as of the close out day of the preceding month reconciled with the net cash flow forwarded to Owner; (v) a security deposit statement; and (vi) Manager's comments and recommendations. . . [and] Manager shall provide weekly occupancy updates to Owner and status of vacant units."

31.    The Agreements also included specific termination provisions, including Section 5.1 of the Agreements, which states: "[t]his Agreement may be terminated by either party without cause effective by written notice delivered to the other party at least sixty (60) days prior to the date of termination."

32.    Section 8.3 of the Agreements states termination notices are effective only upon receipt: "Any notice . . . if sent by United States certified or registered mail, return receipt requested, postage prepaid, or if sent by private, receipted carrier guaranteeing same-day or next-day delivery . . . shall be effective only upon receipt at the above specified address of the addressee named therein."

33.    The Agreements also contain explicit turnover requirements tied to federal compliance. Schedule E ("HUD Compliance Procedures"), subsection 6, provides that upon termination of the Agreement "[t]he Manager will turn over to the Owner all of the Property's cash trust accounts, investments, and records immediately, but in no event more than 30 days after the date the Agreement is terminated."

10

34.    From the outset of their management tenure, Defendants began systematically breaching their contractual duties under the Management Agreements. Rather than fulfilling their obligations to ensure compliant and efficient property operations, Defendants embarked on a pattern of conduct that has undermined the properties' stability, threatened HUD compliance, and jeopardized the welfare of vulnerable residents. These breaches have escalated into a full-scale operational crisis that threatens the continued viability of both Apartment Communities.

### C.    Defendants Fail to Pay Authorized Vendors

35.    The Management Agreements require Defendants to maintain the Apartment Communities, ensure essential services, and pay vendors in a timely manner from the operating accounts. In practice, however, Defendants routinely failed to pay approved vendors for months at a time, jeopardizing property operations and forcing Plaintiffs to repeatedly intervene to prevent service disruptions and lien filings.

36.    Throughout 2025, Plaintiffs repeatedly notified Defendants of unpaid invoices across nearly every category of vendor services, including security, landscaping, maintenance, and construction. Defendants' own accounting personnel admitted that invoices remained unpaid due to internal breakdowns in their accounts payable process and lack of follow-through by on-site and regional management.

37.    Alpha Protection provided security services at the Apartment Communities for more than a year. Despite continuous service, Defendants repeatedly failed to pay Alpha Protection's invoices, causing the vendor to suspend services.

38.    On April 8, 2025, Defendants acknowledged that Alpha Protection had been fully vetted and met all but one of Defendants' insurance requirements but still refused to issue

payment until Plaintiffs executed an additional "waiver", despite Alpha Protection having already been on the job for six months. When Plaintiffs reminded Defendants in August 2025 that authorization to pay the vendor had already been given weeks prior, Defendants again refused, claiming it would not issue payment "without the signed waiver."

39.    On August 18, 2025, Alpha Protection suspended services due to nonpayment. Plaintiffs discovered the suspension only after the vendor directly informed them—Defendants had failed to notify Plaintiffs or respond to the vendor's repeated outreach.

40.    On August 28, 2025, Kunis wrote:

> You have not made one payment to Alpha since that time, which was around 5-6 months ago . . . This vendor has ceased service (again) and now there is no security at either site, which is beyond unacceptable. You need to find a way to make sure this vendor is paid today in full for whatever we owe them on both properties.

41.    As a result of Defendants' refusal to pay, the Apartment Communities were left without on-site security for extended periods, exposing residents to risk and violating Defendants' contractual duties.

42.    Defendants also failed to pay Pro Lawn Care & Landscaping, LLC ("Pro Lawn"), the contracted landscaping company for the Apartment Communities, despite having received and approved invoices under signed seasonal contracts.

43.    On May 13, 2025, Plaintiffs demanded immediate payment after the vendor threatened to quit. Asset Living's accounting department acknowledged that invoices had been "posted" but explained that "operations employees" had not selected them for payment.

44.     By September 2025, Pro Lawn had sent multiple overdue notices and warned of
adding late fees and taking legal action. Plaintiffs again had to intervene to keep the vendor from
walking off the job, writing to Defendants:

> "There is a serious problem regarding the lack of invoice payment
> at both Pueblo Village and Encino . . . Weldon has been
> unresponsive to the vendor. They are threatening to quit. Please
> confirm they are paid immediately."

45.     On October 10, 2025, after months of delays, Pro Lawn informed Plaintiffs that
invoices remained three months past due and that Asset Living was also in default on other
properties it managed.

46.     Similar nonpayment issues plagued nearly every contractor engaged at the
Apartment Communities, including:

- **All Year Gutters, Inc.,** which completed repairs in August 2025 but received no
  response to repeated payment inquiries for over 30 days;

- **J&K Welding and Fabrication**, whose invoices from June 2025 remained
  unpaid by late September, prompting Plaintiffs to warn that "the late fee is Asset
  Living's responsibility";

- **Burton's LLC,** which threatened to file a lien against the Encino property in
  November 2025 after Defendants ignored repeated payment demands;

- **Flow Right Plumbing, Heating, Cooling & Electric**, which reported in
  November 2025 that it was "having quite a bit of difficulty obtaining accounting
  information" from Asset Living and could not determine who was responsible for
  paying invoices; and

13

- **Thompson Striping, LLC**, which performed paving and striping work in October 2025 and had to repeatedly chase Defendants for wire confirmations. Plaintiffs ultimately directed immediate payment after their own attorney's requests to Defendants had been ignored.

47. These repeated failures to pay basic vendors caused material harm to the Apartment Communities, delayed essential repairs and maintenance, and severely damaged Plaintiffs' relationship with long-standing service providers.

48. Defendants' conduct—marked by indifference, internal disorganization, and refusal to follow explicit owner instructions—constitutes gross mismanagement and a breach of the Management Agreements.

## D.    Defendants Fail to Maintain Books and Provide Required Reporting

49. Under the Management Agreements, Defendants were required to maintain complete, accurate and up-to-date books and records for each property and to provide monthly financial statements, reconciled accounts payable ("A/P"), and other financial and operational reporting by the fifteenth (15th) day of each month.

50. In violation of these obligations, Defendants repeatedly failed to maintain accurate books and records, delayed or withheld financial reports for weeks or months, and provided documents that were riddled with errors, duplications, and missing information. These failures made it impossible for Plaintiffs to monitor property performance, pay vendors, or prepare for required lender and regulatory reporting.

51. On October 12, 2025, counsel for Alpha Verde Holdings, LLC (Plaintiffs' holding company) formally requested that Defendants provide fully reconciled A/P aging reports with

14

matching invoices identifying vendor, invoice number/date, amount, GL code, status

(paid/unpaid) with proof of payment, including any Manager Fee components, and corrections to

all misallocations previously flagged by Owners. Defendants failed to provide these materials.

52.     Despite multiple follow-ups, including an October 20, 2025, written demand,

Defendants continued to withhold complete and accurate financial reporting. Their failure to do

so has resulted in unpaid vendor invoices, accruing late fees, and mounting risk of service

disruptions at the HUD properties.

53.     For months, Plaintiffs had been alerting Defendants to widespread financial

mismanagement. On September 26, 2025, Plaintiffs informed Defendants that dozens of utility

bills at Encino Apartments were more than one month overdue and that Defendants' vendor

records were inaccurate and incomplete. Similar warnings were repeated on October 8 and

October 15, when Plaintiffs noted that "bills are not being paid on time and late fees continue to

accrue."

54.     Although Defendants' funding manager acknowledged the problem on October

20, 2025, stating that "Asset Living Corporate . . . [was] working on remedying the situation," no

substantive corrections were made.

55.     On October 27, 2025, Defendants provided untimely "September financials" that

were "littered with errors and completely unreliable." In detailed correspondence that day,

Kunis, itemized numerous misclassifications, missing invoices, and double-counted entries—

underscoring that Defendants' reports could not be used for any meaningful accounting, tax, or

compliance purposes.

56.     That same day, Kunis wrote again documenting Defendants' pattern of false

assurances and nonperformance, including:

- Failure to provide A/P aging reports after repeated verbal and written promises;
- Nonpayment of critical vendors, despite multiple commitments to do so
- Closure of the Sherwin Williams account for nonpayment exceeding $21,000, none of which had been disclosed in prior A/P reports;
- Failure to provide accurate tenant A/R data or current HUD-mandate waitlists.

57.     By October 31, 2025, these failures had escalated to the point where basic

operational functions—such as ordering office supplies, paying utilities, and communicating

with vendors—had broken down entirely.

58.     Defendants' failures to provide accurate records, financial statements, and vendor

information also independently violate Schedule E of the Management Agreements. Schedule E

requires Asset Living to maintain HUD-compliant operational and financial records and to turn

them over promptly and fully upon notice of termination. The repeated withholding, delay, and

obstruction of these materials is inconsistent with Defendants' Schedule E obligations.

59.     Defendants' repeated nonperformance and misrepresentations have deprived

Plaintiffs of the ability to monitor property finances, maintain regulatory compliance, and

transition to a new management company.

**E.      Defendants Neglect Property Operations**

60.     Defendants have also breached their contractual and fiduciary duties by allowing

the properties to fall into disrepair, neglecting tenant management, and failing to maintain basic

compliance with HUD, lender, and safety standards and leaving key positions vacant or filled

with unqualified personnel. Their ongoing mismanagement has left the Apartment Communities

at risk of funding interruption, inspection failure, and even regulatory enforcement actions.

61.     By mid-2025, Defendants' neglect was manifest. In June 2025, Kunis identified at least six tenants who had vacated months earlier owing over $70,000 in unpaid rent. Defendants had failed to move these tenants out in the management system, producing false occupancy data and inaccurate financial reporting. In addition, Defendants left multiple units offline for extended periods—including one building where four adjacent units sat vacant due to unresolved maintenance issues for more than 90 days, despite repeated direction from Plaintiffs to make the units rent-ready. At least 15 units across the portfolio were unoccupied by late summer, yet Defendants had not initiated marketing, waitlist, or the HUD special claim processes to recover the losses.

62.     Defendants' failures soon extended to core health and safety functions. In July 2025, after witnessing severe deterioration at the Pueblo Village property, Kunis wrote to Defendants that she was "speechless and absolutely embarrassed" by the "unkempt, filthy slum" that the property had become. The property, which scored 91B on HUD's prior physical inspection, had received a score of zero during Defendants' mock-NSPIRE inspection—a catastrophic decline reflecting widespread code and habitability violations.

63.     Despite Defendants' assurances that they would "restore the property to the level it deserves," their subsequent efforts consisted mostly of empty promises, cost estimates, and incomplete vendor bids. Over the following months, Plaintiffs repeatedly demanded accountability and a coherent remediation plan. Defendants provided conflicting updates, repeatedly postponed Teams meetings, and at one point refused to attend a scheduled site call, declaring instead that "the team is working on the items that need to be addressed."

64.     By October 2025, multiple inspections confirmed the depth of Defendants' neglect. A CHFA inspection found 25 life-safety deficiencies in just ten units—including smoke detectors improperly installed near air vents and missing fire extinguishers—and recommended a 100% property reinspection. Kunis immediately directed Defendants to correct the same issues across all 128 units, but Defendants failed to do so.

65.     Meanwhile, the property's lender, Walker & Dunlop (servicing a Fannie Mae loan), conducted an exterior inspection identifying corroded stairwells, cracked walkways, damaged fencing, and deteriorating ceilings, classifying several items as life-safety hazards and warning that the property's refinance and federal compliance status were in jeopardy.

66.     Defendants' lack of response was emblematic of their broader mismanagement. Plaintiffs' repeated written demands for daily staffing schedules, repair logs, and proof of tenant notices went unanswered. Even as federal inspections loom, Defendants fail to produce promised documentation or demonstrate basic site oversight.

67.     At the Encino property, the lender conducted a property wide inspection on April 1, 2025 and on April 23, 2025 Defendants were provided with a report detailing numerous deficiencies that were required to be corrected within thirty days and an action plan was to be provided addressing deficiencies needing more time to be corrected. Plaintiff was never made aware of the inspection and its report by Defendants and Defendants never even bothered to respond to the inspection report until June 10, 2025 when the lender notified the Plaintiff that it would exercise its rights and remedies under the loan documents unless the deficiencies were promptly corrected. Even then, Defendants went so far as to manipulate dates on a vendor bid

18

they were soliciting approval for from Plaintiff. Plaintiff had to intervene and handle the hiring of vendors to ensure the deficiencies were promptly corrected and responded to.

68.     In addition, Defendants' failures extended to critical staffing and operational functions at the Apartment Communities. At various times, the property offices were left empty, and no qualified manager or assistant manager was present for extended periods. Temporary staff were placed on-site without adequate training, guidance, or access to necessary resources such as computers, office supplies, or systems for managing tenants and finances. Plaintiffs were forced to personally supply essential items, including cleaning and office supplies to ensure minimal operations.

69.     Notably, Defendants opted to hire a certain property manager for Pueblo Village who they represented had significant real estate and affordable housing experience when in fact they had essentially none. Despite knowing this, Defendants brazenly hired this unqualified individual to act as property manager, who allowed unauthorized individuals, including vagrants, to inhabit multiple vacant units without paying rent. These individuals caused substantial damage to the apartments, including breaking glass and fixtures and leaving human waste throughout the units. Upon information and belief, this property manager was also stealing rent payments from tenants that were meant to be deposited into the property's bank account and credited to their rent and other charges. Despite knowing all of this, Defendants lied and told Ms. Kunis that the property manager was terminated for repeatedly failing to show up for work and for being disorganized. This conduct resulted in tens of thousands of dollars in damage and constitutes a complete violation of applicable regulatory requirements governing the properties.

19

70.     Another example of staffing issues, as recently as November 10, 2025, Plaintiffs raised serious concerns regarding staffing at Encino Apartments, noting that property manager Billie Courtney was no longer employed by Asset Living and that, as a result, there was effectively no office staff on site. This underscores a critical breakdown in Defendants' oversight and their failure to maintain adequate management at the property.

71.     Defendants' sustained dereliction of duty, including permitting substantial property damage, failing to maintain adequate staffing, and failing to provide necessary supplies and operational support, has caused the properties to lose occupancy, lose income, physically deteriorate, and incur reputational harm with vendors and HUD and Fannie Mae. Their failure to maintain safe, habitable, and compliant conditions constitutes a material breach of the Management Agreements.

72.     Plaintiffs repeatedly attempted to resolve these issues in a business-like manner. Kunis sent numerous emails to Asset Living, including direct communications to the Chief Transformation Officer, Cory Hitte, which went entirely unanswered. Despite these efforts, no one at Asset Living, including Mr. Hitte, responded. On October 12, 2025, Plaintiffs' in-house counsel formally reached out to Asset Living regarding these ongoing issues but received no response. Subsequently, outside counsel sent a formal communication on October 20, 2025, which likewise elicited no substantive reply. Outside counsel initiated written and telephonic communication follow ups on October 27, 2025 and October 28, 2025. On October 29, 2025, Asset Living's corporate counsel responded, indicating that they were reviewing the letter and would provide a response; however, to date, no substantive response addressing the concerns has been provided. These repeated failures to respond underscore Asset Living's unwillingness to

engage constructively to resolve the ongoing management and operational issues at the Apartment Communities.

**F.    Defendants' Improper Termination of the Management Agreements**

73.    On or about October 10, 2025, Defendants accused Plaintiffs of an alleged breach and purported to terminate both Management Agreements effective October 20, 2025 unless the purported bogus breaches were cured and if they were, then the termination would be effective December 9, 2025. The notices were sent by Federal Express and were delivered to Kunis on October 13, 2025.

74.    Under Section 8.3 of the Management Agreements, any notice sent by private carrier "guaranteeing same-day or next-day delivery" is deemed effective only upon receipt at the designated address. Accordingly, the termination notices were not effective until October 13, 2025, the date they were actually received.

75.    Because the agreements require at least sixty (60) days' notice for termination without cause, the earliest possible effective date for termination would be December 12, 2025. Defendants' attempted termination, effective December 9, 2025, therefore failed to comply with the contractual notice requirements and was untimely and defective on its face.

76.    Even setting aside this procedural defect, Defendants' termination was improper and without cause. On October 16, 2025, corporate counsel for Asset Living, Judge Sallans, communicated directly with Kunis and confirmed the following:

- Plaintiffs were not in breach of the Management Agreements; and
- Defendants would continue to perform their contractual obligations in good faith;

77.    Despite these unequivocal assurances, Defendants subsequently reversed course. On October 29, 2025, Defendants' counsel reiterated to Plaintiffs' counsel that the Management

Agreements would nevertheless terminate on December 9, 2025, explicitly relying on the same defective October 10, 2025 notices. Defendants have since used those invalid notices to justify ceasing performance, obstructing vendor relationships, and interfering with property operations – conduct that is inconsistent with their obligations under the Management Agreements.

78.     In addition, Defendants have refused to provide Plaintiffs with the documents necessary to transition management of the properties to a new management company. Specifically, Defendants have failed to deliver a true, correct, and fully reconciled A/P aging reports with matching invoices identifying vendor, invoice number/date, amount, GL code, status (paid/unpaid) with proof of payment, including any Manager Fee components, and corrections to all misallocations previously flagged. These documents are expressly required under the Management Agreements and are indispensable to ensuring financial accuracy, continuity of vendor payments, and compliance with HUD and lender reporting requirements.

79.     Without this information, Plaintiffs are unable to secure a replacement management company, leaving the properties—all of which are HUD-regulated affordable housing units—effectively stranded without operational oversight as a result of Defendants' wrongful and premature termination.

**G.      Risk of Irreparable Harm to Apartment Communities and Residents if Defendants Abandon Management Duties**

80.     If Defendants proceed with their wrongful and premature termination of the Management Agreements and abandon their management duties, the consequences to the Apartment Communities and their residents will be immediate, severe, and irreparable.

81.     The properties at issue require continuous qualified management to remain in compliance with federal housing regulations, as well as state and local law. If Defendants walk

off the job before a proper transition can occur, the properties will be left without on-site staff or operational oversight. There would be no personnel available to pay vendors or utilities, collect rent, process tenant certifications or recertifications, order necessary supplies, maintain habitability standards, or lease vacant units. In short, the Apartment Communities could not function in any meaningful way.

82.    Such an abandonment would immediately place the properties out of compliance with HUD and CHFA regulatory agreements. HUD and CHFA could impose punitive enforcement measures, including termination of the Section 8 housing assistance payment contracts and suspension of Plaintiffs from future HUD participation. These outcomes would be devastating to Plaintiffs and the low-income tenants who rely on the properties for safe, affordable housing.

83.    The timing of Defendants' intended withdrawal also creates an acute and foreseeable risk of failing the scheduled HUD inspection on December 4, 2025—a failure that would have cascading consequences. A failed inspection would result in the issuance of a HUD "flag", impairing Plaintiffs' ability to engage in any new HUD-related business until all deficiencies are corrected and the property passes a reinspection. Given Defendants have stated an intent to cease management on December 9, 2025, it would be impossible to correct outstanding deficiencies, schedule reinspection, and restore compliance within that brief window. This failure could deter qualified replacement managers from taking over the properties at all.

84.    In addition to the operational collapse that would result if Defendants abandoned the properties without a transition, the regulatory consequences are immediate and severe.

23

Because both properties are HUD-regulated Section 8 developments, HUD must approve any new management agent before the agent begins operating. Management agents are treated as "controlling participants," and a change in agent without prior HUD approval is deemed a compliance violation by the owner. When this occurs, HUD typically issues APPS compliance flags against the owner and its principals—flags that bar them from receiving approval to participate in any HUD-assisted project while the flag is active. HUD may also refuse to process or release HAP (Section 8) subsidy payments until a management agent is properly approved. These penalties directly threaten the properties' only source of rental subsidy and jeopardize Plaintiffs' ability to operate, refinance, or maintain any HUD-regulated portfolio going forward. Once imposed, APPS flags carry lasting consequences that money damages cannot remedy.

85.     In addition, Kunis is currently in the process of refinancing Pueblo Village, a transaction that has already been jeopardized and financially impaired by Defendants' mismanagement, high vacancy rates, and failure to provide accurate financial information. Any further deterioration in property operations—or a failed HUD inspection—would almost certainly cause the refinancing to collapse resulting in significant financial loss and long-term harm to the viability of the properties.

86.     Accordingly, unless the Court intervenes to enjoin Defendants from abandoning their duties and compel them to continue performing their contractual obligations pending a full adjudication of this matter, Plaintiffs and their residents will suffer irreparable injury that cannot be remedied through monetary damages alone.

24

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract)**
**(Against All Defendants)**

87.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 86 above as though set forth fully herein.

88.     As alleged herein, Plaintiffs and Defendants entered into the Management Agreements as of July 31, 2023.

89.     The Management Agreements are binding and enforceable contracts between PV LLC and Defendants, and Encino LLC and Defendants, respectively.

90.     Plaintiffs performed all conditions, covenants, and promises that they were required to perform under the Agreements, except for those conditions, covenants, and promises that they were excused from performing as a result of Defendants' breaches and other misconduct, as alleged herein.

91.     All conditions required for Defendants' performance under the Agreements have occurred.

92.     Defendants have materially breached the terms of the Agreements by, among other things: (a) failing to collect rents from the Apartment Communities' tenants and properly manage accounts receivable; (b) failing to properly maintain the Apartment Communities; (c) failing to pay vendors and maintain accounts payable records; (d) failing to maintain compliance with HUD and CHFA requirements; (e) failing to adequately track and manage tenant occupancy and vacancies; (f) failing to provide timely and accurate reporting to Plaintiffs; (g) failing to maintain adequate, trained, and qualified property management staff and (h) improperly terminating the Management Agreement, including sending defective and

25

untimely notices, refusing to retract the termination after confirmation that Plaintiffs were not in breach, and interfering with Plaintiffs' ability to transition management to a new management company; and (i) failing to comply with Schedule E – HUD Compliance Procedures, which require Asset Living to "turn over to the Owner all of the Property's cash trust accounts, investments, and records" within the thirty-day contractual window beginning when Defendants provided termination notices.

93.     HUD Handbook 4350.1, Chapter 6; Form HUD-9834; 24 C.F.R. Part 5, Subpart G; and 24 C.F.R. Part 200, Subpart P impose mandatory federal standards governing physical maintenance, inspection readiness, management oversight, and day-to-day operations of HUD-regulated properties. Through their Project Owner's/ Management Agent's Certification, Defendants agreed to adhere to these federal requirements. Defendants' deterioration of the Properties, failure to maintain basic habitability, and the zero mock NSPIRE inspection score demonstrate systemic violations of these federal regulations. These federal-regulatory violations constitute additional breaches of Defendants' contractual obligations, as the Management Agreements and Certifications require compliance with all HUD operational standards.

94.     On December 3, 2025, Asset Living employee Nathinial Smith notified Ms. Kunis via email that the Apartment Communities' "portals and payments will be disabled" beginning December 8, 2025, and further indicated that Asset Living intended to "slowly offboard[] site teams," stop processing invoices and utility bills, and wind down core operational systems between December 8 and December 12. This accelerated shut-down directly contracts Defendants' counsel repeated representations that Asset Living's termination date is December 13, 2025. This conduct constitutes an independent breach of Section 2 of the HUD Project

Owner's/ Management Agent's Certification, which requires the Manager to "select and admit tenants, compute tenant rents and assistance payments, recertify tenants and carry out other subsidy contract administration responsibilities in accordance with HUD Handbook 4350.3 and other HUD instructions." Maintaining functional electronic systems—including accounting portals, rent-payment platforms, voucher submission systems, and subsidy-processing tools—is essential to fulfilling these mandated duties. By unilaterally shutting down these systems and withdrawing operational personnel before the effective termination date, and before any successor management company had access to required records or systems, Defendants materially breached their contractual obligations and jeopardized Plaintiffs' ability to comply with federal Section 8 requirements.

95.     Resolution of these breaches necessarily requires the Court to interpret federal law and HUD regulatory requirements incorporated into the Agreements, including Defendants' obligations to comply with Section 8 Housing Assistance Program rules governing tenant certifications, subsidy calculations, voucher processing, federal inspection standards, and other federally mandated operational duties.

96.     As a proximate result of Defendants' material breaches of the Agreements, Plaintiffs have suffered and will continue to suffer substantial and irreparable harm, including, but not limited to: loss of control over the Apartment Communities; risk of HUD and CHFA sanctions; impairment of refinancing efforts; operational and financial instability; lost profits; lost business opportunities; and other economic damages in an amount to be proven at trial.

**SECOND CLAIM FOR RELIEF**
**(Anticipatory Breach of Contract)**
**(Against All Defendants)**

97.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 96 above as though set forth fully herein.

98.     As alleged herein, Plaintiffs and Defendants entered into the Management Agreements as of July 31, 2023.

99.     The Management Agreements are binding and enforceable contracts between PV LLC and Defendants, and Encino LLC and Defendants, respectively.

100.    Plaintiffs performed all conditions, covenants, and promises that they were required to perform under the Agreements, except for those conditions, covenants, and promises that they were excused from performing as a result of Defendants' breaches and other misconduct, as alleged herein.

101.    All conditions required for Defendants' performance under the Agreements have occurred.

102.    On or about October 10, 2025, Defendants delivered notices purporting to terminate both Management Agreements, effective December 9, 2025. These notices constitute a clear and unequivocal manifestation that Defendants intended to cease performance under the Agreements.

103.    Defendants subsequent conduct—including refusal to provide accurate, reconciled accounts payable reports, withholding operational information, interfering with vendors, and failing to perform essential management duties—further demonstrate their intent not to perform their contractual obligations.

28

104. Defendants' stated intent to cease management without providing the federally required records and certifications further constitutes an anticipatory breach of obligations tied directly to Plaintiffs' Section 8 HAP contracts, the HUD regulatory scheme, and federal NSPIRE inspection standards; adjudicating this claim will necessarily require interpretation of federal statutory and regulatory requirements governing subsidized housing.

105. As a proximate result of Defendants' anticipatory breach, Plaintiffs have suffered and will continue to suffer substantial and irreparable harm, including, but not limited to: loss of control over the Apartment Communities; risk of HUD and CHFA sanctions; impairment of refinancing efforts; operational and financial instability; lost profits; lost business opportunities; and other economic damages in an amount to be proven at trial.

**THIRD CLAIM FOR RELIEF**
**(Breach of Fiduciary Duty)**
**(Against All Defendants)**

106. Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 105 above as though set forth fully herein.

107. As alleged herein, Plaintiffs and Defendants entered into the Management Agreements as of July 31, 2023.

108. The Management Agreements are binding and enforceable contracts between PV LLC and Defendants, and Encino LLC and Defendants, respectively.

109. Plaintiffs performed all conditions, covenants, and promises that they were required to perform under the Agreements, except for those conditions, covenants, and promises that they were excused from performing as a result of Defendants' breaches and other misconduct, as alleged herein.

29

110.    All conditions required for Defendants' performance under the Agreements have occurred.

111.    Under the Management Agreements, Defendants were the appointed management agent for the Apartment Communities and had exclusive control over critical operations, including: rent collection, vendor payments, tenant communications, maintenance, regulatory compliance, and financial reporting.

112.    By virtue of their authority and control, Defendants were obligated to act in the best interests of Plaintiff, to avoid self-dealing, to provide accurate and complete financial and operational information, and to maintain the Apartment Communities in compliance with all applicable regulations and contractual obligations.

113.    Defendants breached their fiduciary duties by, among other things: (a) failing to collect rents from the Apartment Communities' tenants and properly manage accounts receivable; (b) failing to properly maintain the Apartment Communities; (c) failing to pay vendors and maintain accounts payable records; (d) failing to maintain compliance with HUD and CHFA requirements; (e) failing to adequately track and manage tenant occupancy and vacancies; (f) failing to provide timely and accurate reporting to Plaintiffs; (g) failing to maintain adequate, trained, and qualified property management staff and (h) taking actions inconsistent with Plaintiffs' interests, including attempting to improperly terminate the Management Agreements and interfere with operational continuity.

114.    As a proximate result of Defendants' breaches, Plaintiffs have suffered and will continue to suffer substantial and irreparable harm, including, but not limited to: loss of control over the Apartment Communities; risk of HUD and CHFA sanctions; impairment of refinancing

efforts; operational and financial instability; lost profits; lost business opportunities; and other economic damages in an amount to be proven at trial.

**FOURTH CLAIM FOR RELIEF**
**(Conversion)**
**(Against All Defendants)**

115.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 114 above as though set forth fully herein.

116.    Defendants have exercised dominion and control over property belonging to Plaintiffs, including, but not limited to, rent rolls, accounts payable records, invoices, operational and financial documents, and other materials necessary for the proper management and operation of the Apartment Communities.

117.    This property belongs to Plaintiffs and is essential for the ongoing management, maintenance, and leasing of the Apartment Communities.

118.    Defendants' exercise of control over these materials is not authorized. While Defendants initially had lawful possession as the management company, their ongoing refusal to provide Plaintiffs with complete, accurate, and reconciled records constitutes an unauthorized exercise of dominion. By failing and refusing to return these materials despite repeated demands, Defendants have converted Plaintiffs' property.

119.    Plaintiffs have repeatedly demanded that Defendants deliver all property and records necessary to manage the Apartment Communities, including by correspondence dated October 12, 2025, and thereafter. Defendants have refused these demands.

120.    As a proximate result of Defendants' conversion, Plaintiffs have suffered and will continue to suffer damages, including, but not limited to: (a) lost profits from mismanaged and

31

uncollectable rents; (b) lost business opportunities to secure new management agreements and

refinancing; (c) the ongoing inability to transition the properties to a new management company;

and (d) other general and specific damages in amounts to be proven at trial.

**FIFTH CLAIM FOR RELIEF**
**(Negligence)**
**(Against All Defendants)**

121.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1

through 120 above as though set forth fully herein.

122.    As alleged herein, Plaintiffs and Defendants entered into the Management

Agreements as of July 31, 2023.

123.    The Management Agreements are binding and enforceable contracts between PV

LLC and Defendants, and Encino LLC and Defendants, respectively.

124.    Plaintiffs performed all conditions, covenants, and promises that they were

required to perform under the Agreements, except for those conditions, covenants, and promises

that they were excused from performing as a result of Defendants' breaches and other

misconduct, as alleged herein.

125.    All conditions required for Defendants' performance under the Agreements have

occurred.

126.    Defendants owed a duty of care to Plaintiffs under the terms of the Management

Agreement to act reasonably and competently in performing their management, maintenance,

and operational responsibilities for the Apartment Communities. This duty included, but was not

limited to (a) renting out units in the Apartment Communities; (b) collecting rent and properly

managing accounts receivable; (c) properly maintaining the Apartment Communities; (d) paying

32

vendors and maintain accounts payable records; (e) maintaining compliance with HUD and CHFA requirements; (f) adequately track and manage tenant occupancy and vacancies; (g) providing timely and accurate reporting to Plaintiffs; and (h) maintaining adequate, trained, and qualified property management staff.

127.   Defendants breached their duty of care by failing to perform all of these obligations with the requisite skill, care, and diligence.

128.   As a proximate result of Defendants' negligence, Plaintiffs have suffered and will continue to suffer substantial and irreparable harm, including, but not limited to: loss of control over the Apartment Communities; risk of HUD sanctions; impairment of refinancing efforts; operational and financial instability; lost profits; lost business opportunities; and other economic damages in an amount to be proven at trial.

**SIXTH CLAIM FOR RELIEF**
**(Breach of the Implied Covenant of**
**Good Faith and Fair Dealing)**
**(Against All Defendants)**

129.   Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 128 above as though set forth fully herein.

130.   As alleged herein, Plaintiffs and Defendants entered into the Management Agreements as of July 31, 2023.

131.   The Management Agreements are binding and enforceable contracts between PV LLC and Defendants, and Encino LLC and Defendants, respectively.

132.   Plaintiffs performed all conditions, covenants, and promises that they were required to perform under the Agreements, except for those conditions, covenants, and promises

that they were excused from performing as a result of Defendants' breaches and other misconduct, as alleged herein.

133.    All conditions required for Defendants' performance under the Agreements have occurred.

134.    In every contract governed by Colorado law, including the Agreements, an implied obligation of good faith and fair dealing is imposed upon all parties to the contract prohibiting them from engaging in any acts the purpose of which is to deny the benefits of the contract to the other parties, and/or conduct that otherwise deprives the other parties of such benefits.

135.    As alleged herein, Defendants engaged in conduct for the purpose of denying Plaintiffs the benefits of the Agreements, and/or conduct that has otherwise deprived Plaintiffs of such benefits. Specifically, Defendants deprived Plaintiffs of the benefits of their bargain by, among other things: (a) failing to collect rents from the Apartment Communities' tenants and properly manage accounts receivable; (b) failing to properly maintain the Apartment Communities; (c) failing to pay vendors and maintain accounts payable records; (d) failing to maintain compliance with HUD requirements; (e) failing to adequately track and manage tenant occupancy and vacancies; (f) failing to provide timely and accurate reporting to Plaintiffs; (g) improperly and prematurely attempting to terminate the Management Agreements without cause or adherence to contractual notice requirements; (h) failing to timely and adequately address issues identified during inspections; (i) failing to maintain adequate, trained, and qualified property management staff; and (j) engaging in conduct inconsistent with the fiduciary

34

obligations owed to Plaintiffs, including interference with vendors, obstruction of management

transitions, and misrepresentation of operational status.

136.    As a proximate result of Defendants' bad faith conduct, Plaintiffs have suffered

and will continue to suffer substantial and irreparable harm, including, but not limited to: loss of

control over the Apartment Communities; risk of HUD sanctions; impairment of refinancing

efforts; operational and financial instability; lost profits; lost business opportunities; and other

economic damages in an amount to be proven at trial.

**SEVENTH CLAIM FOR RELIEF**
**(Tortious Interference With Contractual Relations)**
**(Against All Defendants)**

137.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1

through 136 above as though set forth fully herein.

138.    As alleged herein, Plaintiffs maintain binding and enforceable contractual

relationships with HUD with respect to the Section 8 Housing Assistance Payment contracts for

the Apartment Communities. These contracts impose on Plaintiffs a range of obligations,

including, but not limited to, maintaining the Apartment Communities in safe and sanitary

condition, complying with HUD inspection standards, and ensuring timely rent collection and

reporting.

139.    Defendants had actual knowledge of Plaintiffs' contracts with HUD. Defendants'

conduct—including but not limited to: (a) failing to collect rents from the Apartment

Communities' tenants and properly manage accounts receivable; (b) failing to properly maintain

the Apartment Communities; (c) failing to pay vendors and maintain accounts payable records;

(d) failing to maintain compliance with HUD requirements; (e) failing to adequately track and

35

manage tenant occupancy and vacancies; (f) failing to provide timely and accurate reporting to Plaintiffs; (g) improperly and prematurely attempting to terminate the Management Agreements without cause or adherence to contractual notice requirements; (h) failing to timely and adequately address issues identified during inspections; (i) failing to maintain adequate, trained, and qualified property management staff; and (j) engaging in conduct inconsistent with the fiduciary obligations owed to Plaintiffs, including interference with vendors, obstruction of management transitions, and misrepresentation of operational status— was intended to, and did interfere with Plaintiffs' performance under their HUD contracts.

140.    Defendants' actions have jeopardized the Apartment Communities' compliance with HUD requirements and risked severe regulatory consequences, including the potential termination of the Section 8 contracts, imposition of HUD flags, and prohibition from conducting future HUD-related business.

141.    Because Plaintiffs' contractual relationships with HUD and CHFA incorporate federally mandated obligations—including requirements arising under the Section 8 Housing Assistance Payments contracts and HUD's NSPIRE regulatory framework—the determination of whether Defendants improperly interfered with those relationships necessarily requires reference to, and interpretation of, federal law. The federal statutory and regulatory obligations governing Plaintiffs' performance under their Section 8 contracts define the scope of the contractual rights with which Defendants interfered, and further establish the regulatory harm caused by Defendants' conduct. Accordingly, the adjudication of this claim will necessarily require the Court to interpret federal housing requirements to determine the nature and extent of the interference.

142.   As a proximate result of Defendants' bad faith conduct, Plaintiffs have suffered and will continue to suffer substantial and irreparable harm, including, but not limited to: loss of control over the Apartment Communities; risk of HUD sanctions; impairment of refinancing efforts; operational and financial instability; lost profits; lost business opportunities; and other economic damages in an amount to be proven at trial.

**EIGHTH CLAIM FOR RELIEF**
**(Declaratory Judgment – Failure to Provide**
**Contractually Required Information)**
**(Against All Defendants)**

143.   Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 142 above as though set forth fully herein.

144.   An actual controversy exists between Plaintiffs and Defendants concerning Defendants' obligations under the Management Agreements to provide Plaintiffs with complete and accurate financial, operational, and vendor information necessary to facilitate an orderly transition of management to a replacement management company.

145.   Plaintiffs contend that, under the express terms of the Management Agreements, Defendants are required to maintain and produce such records, including but not limited to an accurate list of all current payables, including supporting invoices (Agreements at §§ 2.4, 2.8, 3.2, 3.5), accurate rent rolls (*id*. §§ 2.1-2.3), accurate financial statements (*id*. § 3.5); accurate status of all current evictions (*id*. §§ 2.1-2.3), an accurate tenant delinquency and collection reports (*id*. §§ 2.1-2.3), and other materials necessary for compliance with HUD and CHFA requirements and for continuity of property management (*id*. §§ 2.6, 2.14).

146.   Plaintiffs contend that, under the express terms of the Management Agreements, Schedule E, and the Project Owner's/Management Agent's Certifications, Defendants have an

37

obligation to provide complete and timely records, financial date, regulatory compliance information, and operational materials.

147.    Defendants have failed and refused to provide these materials despite repeated requests, preventing Plaintiffs from retaining a qualified replacement management company and jeopardizing ongoing compliance with federal and state housing regulations.

148.    Defendants' refusal to comply with these provisions—including failure to turn over records within the required 30-day period, violation of federal management standards, and premature off-boarding—necessitates a judicial declaration to determine the rights and obligations of the parties under the Management Agreements, including that Defendants are required to promptly provide the records and materials necessary for transition and regulatory compliance.

149.    In addition, Plaintiffs seek a declaration that, because Defendants have failed to provide the records, financial information, compliance materials, and other documents required under the Management Agreements—including those required under Schedule E and the HUD/CHFA regulatory certifications—Defendants remain obligated to continue performing all management services until at least sixty (60) days after they have produced all missing and corrected information in full.

**NINTH CLAIM FOR RELIEF**
**(Declaratory Judgment – Invalid Termination)**
**(Against All Defendants)**

150.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 149 above as though set forth fully herein.

151.    An actual controversy exists between Plaintiffs and Defendants concerning the validity and effect of Defendants' purported terminations of the Management Agreements governing the Apartment Communities.

152.    Plaintiffs contend that Defendants' attempted terminations are invalid, ineffective, and in breach of the Management Agreements because Defendants failed to comply with the contractual prerequisites to termination, including providing adequate notice, curing alleged defaults, and cooperating in the transition of management responsibilities.

153.    Plaintiffs further contend that Defendants' purported terminations were made in bad faith and without justification, and that Defendants remain bound by the terms of the Management Agreements until such time as those Agreements are validly terminated in accordance with their express terms.

154.    Defendants' attempted termination is further invalid because they have already violated multiple contractual and regulatory obligations tied directly to the termination process. First, Schedule E of the Management Agreements requires Asset Living to turn over to the Owner all of the Property's cash trust accounts, investments, and records within 30 days of the date the Agreement is terminated. Defendants indisputably failed to comply with this requirement: despite issuing termination notices in early October, they withheld critical records and compliance files well beyond the 30-day deadline and refused to produce them even after multiple written demands. Second, on December 3, 2025, Asset Living informed Ms. Kunis that both properties' "portals and payments will be disabled" beginning December 8, 2025—effectively initiating off-boarding five days before the December 13 termination date that Defendants repeatedly represented through counsel. This premature shutdown of accounting

39

systems, payment mechanisms, and operational portals—without any transition plan and without a successor manager in place—contradicts Defendants' contractual obligations to perform management services through the termination date and confirms that Defendants have repudiated and misapplied the termination provisions.

155.    Because the purported terminations are invalid and ineffective, Defendants remain obligated to perform all duties and responsibilities required under the Management Agreements, including but not limited to maintaining accurate records, providing complete financial and operational information to Plaintiffs, curing any deficiencies identified in HUD and CHFA inspections, and cooperating in any transition to replacement management.

156.    Defendants, by contrast, assert that they have lawfully terminated the Management Agreements and that they have no further obligations thereunder.

157.    A judicial declaration is therefore necessary to resolve this dispute and to determine the rights and obligations of the parties under the Management Agreements, including that the purported terminations are invalid, ineffective, and constitute a breach of contract.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for entry of judgment in their favor and against Defendants on all of Plaintiffs' claims, and for the following relief:

1.    Declaratory Relief—A declaration that:

    a.    Defendants are required under the Management Agreements to provide all current payables, including supporting invoices (Agreements at §§ 2.4, 2.8, 3.2, 3.5), accurate rent rolls (*id.* §§ 2.1-2.3), accurate financial statements (*id.* § 3.5); accurate status of all current evictions (*id.* §§ 2.1-

2.3), an accurate tenant delinquency and collection reports (*id.* §§ 2.1-2.3), and other materials necessary for compliance with HUD and CHFA requirements and for continuity of property management (id. §§ 2.6, 2.14);

b.   Defendants' purported terminations of the Management Agreements are invalid, ineffective, and in breach of the Agreements; and

c.   Defendants remain obligated to perform all duties under the Management Agreements until they are properly terminated in accordance with the terms of the Agreements.

2.   Injunctive Relief—A preliminary and permanent injunction restraining Defendants from:

a.   Abandoning or ceasing management operations at the Apartment Communities;

b.   Interfering with Plaintiffs' ability to perform under the Management Agreements or HUD contracts

c.   Refusing to provide Plaintiffs with operational, financial, and accounting records necessary to transition management or comply with HUD and lender requirements; and

d.   Otherwise taking any action that would threaten the health, safety, or financial stability of the Apartment Communities.

3.   For compensatory damages according to proof at trial;

4.   For special and consequential damages according to proof at trial;

5.   For punitive damages;

41

6.    For Plaintiffs' costs of suit and reasonable attorneys' fees under the Agreements

and/or applicable law; and

7.    For such other and further relief, whether legal or equitable, as the Court deems

just and proper.

Dated:  December 3, 2025

Respectfully submitted,

s/*Jessica J. Smith*
Jessica J. Smith
Lillian G. Holbrook
HOLLAND & HART LLP
555 17th Street, Suite 3200
Denver, CO 80202-3921
Telephone: 303.295.8000
JJSmith@hollandhart.com
LGHolbrook@hollandhart.com

James L. Barnett (Application Forthcoming)
HOLLAND & HART LLP
222 South Main Street, Suite 2200
Salt Lake City, UT 84101-2194
Telephone: 801.799.5800
JBarnett@hollandhart.com

**Attorneys for Plaintiffs**

Plaintiff's Address:
Encino Acquisition, LLC
111 Murray Street, Suite 36A
New York, NY 10007

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2025, I have caused to be electronically filed the

foregoing with the Clerk of Court using CM/ECF system which will send notification of such

filing to all counsel of record.

_s/Jessica J. Smith_

Jessica J. Smith
Holland & Hart LLP

36464881_v1