IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang

Civil Action No. 25-cv-03609-NYW-TPO

PUEBLO VILLAGE ACQUISITION, LLC, and
ENCINO ACQUISITION, LLC,

    Plaintiffs,

v.

ASSET PLUS USA, LLC,
ASSET LIVING, LLC, and
ALPHA BARNES REAL ESTATE SERVICES, LLC,

    Defendants.

## ORDER

This matter is before the Court on Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ("Motion" or "Motion for TRO"). [Doc. 5]. This Order addresses the portion of the Motion that requests a temporary restraining order. Defendants have responded to this portion of the Motion. [Doc. 20 at 1–2 & n.1]. On December 3, 2025, the Court held an evidentiary hearing on the Motion and heard oral arguments from the Parties. [Doc. 28]. For the reasons set forth herein, the Motion is respectfully **GRANTED in part** and **DENIED in part**.

## BACKGROUND

This case arises from a dispute between the owners and managers of two residential apartment properties (the "Properties") in Pueblo, Colorado. The Properties are regulated affordable housing communities subsidized and subject to oversight by the U.S. Department of Housing and Urban Development ("HUD"). [Doc. 5-1 at ¶ 2]. One

property is owned by Plaintiff Pueblo Village Acquisition, LLC ("Pueblo"). [*Id.* at ¶ 1]. The other is owned by Plaintiff Encino Acquisition, LLC ("Encino") (together with Pueblo, "Plaintiffs"). [*Id.*]. Through another entity, Pueblo and Encino are owned by non-party Allison Kunis ("Ms. Kunis"). [*Id.*]. Defendants are three related entities that "operate[] as a unified management enterprise." [*Id.* at ¶ 5]. Plaintiffs entered into agreements ("Management Agreements") with one Defendant, Alpha Barnes Real Estate Services, LLC ("Alpha Barnes"), to provide management services for the Properties. *See* [Doc. 5-2; Doc. 5-3].

The Management Agreements are identical in all material respects. *Compare* [Doc. 5-2], *with* [Doc. 5-3]. As relevant to the Motion, the Management Agreements require Defendants to "timely pay all bills or invoices" and maintain "a comprehensive system of office records, books and accounts." [Doc. 5-2 at § 3.5]. Defendants are required to provide Plaintiffs with a monthly financial report, including a report of accounts payable, rent rolls, and occupancy reports. [*Id.*]. The Management Agreements also require Defendants to enforce leases against tenants, including through eviction, and to "keep [Plaintiffs] informed of such actions and procedures and follow such instructions as [Plaintiffs] may prescribe . . . ." [*Id.* at § 2.3]. The Management Agreements permit either party to terminate the agreement without cause via written notice at least 60 days prior to the date of termination. [*Id.* at § 5.1]. Written notice is effective upon receipt. [*Id.* at § 8.3].

Over time, the relationship between Ms. Kunis, Plaintiffs, and Defendants turned "toxic." [Hearing Tr. at 7:9–14].[1]  Plaintiffs allege that Defendants failed to timely pay invoices issued by authorized vendors, failed to properly maintain and disclose financial records to Plaintiffs, and have generally failed to adequately manage the Properties. *See generally* [Doc. 30 at ¶¶ 35–72; Doc. 5-1 at ¶ 7].  On October 10, 2025, Defendants mailed notices of termination of both Management Agreements to Plaintiffs. [Doc. 5-1 at ¶ 12]. The notices were received on October 13, 2025. [*Id.*].

Ms. Kunis began seeking a replacement management company immediately after she received the termination notices. [Hearing Tr. at 36:22–37:9]. But because Defendants had not—and have not—provided certain documents required by the Management Agreements, Ms. Kunis asserts that she is unable to obtain a replacement management company or effectively begin the transition from Defendants to a new property manager. [*Id.* at 34:23–35:10; Doc. 5-1 at ¶¶ 13, 15]. Ms. Kunis testified that, at present, Defendants have failed to timely provide the following documents:

- Invoices underlying Defendants' final financial reports for September 2025, [Hearing Tr. at 19:23–20:12];
- A final financial report for October 2025 for the property owned by Pueblo,[2] [*id.* at 22:9–15];

---

[1] The Court cites to a preliminary, nonpublic version of the transcript of the evidentiary hearing on December 3, 2025. Accordingly, there may be some variations with respect to page numbers, line numbers, and precise language, should an official transcript be ordered and prepared.

[2] During the hearing, the Court and the Parties referred to this property as the "Alma Avenue property." [Hearing Tr. at 22:9–12]; *see also* [Doc. 5-2 at 1].

3

- Invoices underlying Defendants' final financial reports for October 2025, [*id.* at 22:16–23:1];

- An updated accounts payable report that reflects all unpaid vendor invoices, [*id.* at 28:18–29:15];

- "Eviction trackers" describing Defendants' efforts to evict the "top 20 to 25" tenants with the highest delinquent amounts, including whether required notices have been provided, [*id.* at 30:11–32:3];

- Accurate rent rolls for November for the property owned by Pueblo, [*id.* at 33:18–34:18].

Ms. Kunis asserts that "[e]ach prospective management company told me the same thing: without these materials, they cannot safely assume management or take responsibility for the properties." [Doc. 5-1 at ¶ 13].

Plaintiffs seek preliminary injunctive relief on two of their nine claims for relief. [Doc. 5 at 2, 11–17]. *See generally* [Doc. 1 at ¶¶ 81–143; Doc. 30 at ¶¶ 87–157].[3] Both of these claims seek declaratory relief. [Doc. 30 at ¶¶ 143–57]. First, Claim Eight seeks a declaration that (1) the Management Agreements require Defendants to "promptly provide the records and materials necessary for transition and regulatory compliance"; and (2) Defendants' failure to provide all required documents obligates them to "continue

---

[3] At the hearing, Plaintiffs discussed with the Court their intent to amend their complaint to assert federal question jurisdiction. [Hearing Tr. at 80:17–81:18]. Later that day, Plaintiffs filed their Amended Complaint as a matter of right pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure. [Doc. 30]. As relevant to the claims that form the basis for the Motion, the allegations in the Complaint and Amended Complaint are substantially the same. *Compare* [Doc. 1 at ¶¶ 132–43], *with* [Doc. 30 at ¶¶ 143–57]. Accordingly, the Court relies on the allegations in the operative Amended Complaint for purposes of the Motion.

performing all management services until at least sixty (60) days after they have produced all missing and corrected information in full." [*Id.* at ¶¶ 148–49]. Second, Claim Nine seeks a declaration that Defendants' termination notices are "invalid, ineffective, and constitute a breach of contract," such that Defendants "remain bound by the terms of the Management Agreements until . . . those agreements are validly terminated . . . ." [*Id.* at ¶¶ 153, 157]. The Motion seeks a temporary restraining order "requiring Defendants to continue performing their contractual obligations and to provide all records necessary to ensure a safe and orderly transition of management." [Doc. 5 at 22].

## LEGAL STANDARD

Federal Rule of Civil Procedure 65 authorizes the Court to enter preliminary injunctions and issue temporary restraining orders. Fed. R. Civ. P. 65(a), (b). The requirements for issuing a temporary restraining order mirror the requirements for issuing a preliminary injunction. *Briscoe v. Sebelius*, 927 F. Supp. 2d 1109, 1114 (D. Colo. 2013). A party seeking preliminary injunctive relief must satisfy four factors: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004). A "plaintiff's failure to prove any one of the four preliminary injunction factors renders its request for injunctive relief unwarranted." *Vill. of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 766 (10th Cir. 2014).

5

## ANALYSIS

**I.   Jurisdiction**

In their Response, Defendants contend that the Court "lacks jurisdiction to consider Plaintiffs' Motion."  [Doc. 20 at 2]; *see also* [Doc. 17 (Defendants' motion to dismiss for lack of jurisdiction)].  Defendants argue that complete diversity between the Parties is lacking, so the Court must dismiss the case for lack of subject matter jurisdiction.  *See* [Doc. 17].  Subsequently, Plaintiffs filed an Amended Complaint that asserts federal question jurisdiction.  [Doc. 30].  The filing of an amended pleading moots a pending motion to dismiss aimed at a now-inoperative pleading.  *See Gotfredson v. Larsen LP*, 432 F. Supp. 2d 1163, 1172 (D. Colo. 2006) (explaining that an amended pleading moots any motions to dismiss aimed at an inoperative pleading); *Strich v. United States*, No. 09-cv-01913-REB-KLM, 2010 WL 148269, at *1 (D. Colo. Jan. 11, 2010) ("The filing of an amended complaint moots a motion to dismiss directed at the complaint that is supplanted and superseded.").  In light of the Amended Complaint, this Court respectfully disregards this basis for denying the instant Motion for TRO and **DENIES** Defendants' Motion to Dismiss as moot.  [Doc. 17].[4]

---

[4]  The Court originally ordered the Parties to meet and confer to determine whether jurisdictional discovery was necessary to ascertain whether Defendants' ownership structure includes individuals domiciled in the same state as Ms. Kunis, as those individuals' citizenship would be imputed to Defendants, and to meet and confer about the impact of the Amended Complaint upon Defendants' challenge to subject matter jurisdiction.  *See* [Doc. 28 at 2].  But in light of the operative Amended Complaint, the Court notes that even if Defendants were to prevail on their challenge to diversity jurisdiction, Plaintiffs' Amended Complaint invokes an alternative basis for subject matter jurisdiction.  To the extent that Defendants seek to challenge the invocation of federal question <u>and</u> diversity jurisdiction, they may file a new motion directed at the entirety of the Amended Complaint.  The Court makes no findings or conclusions at this time as to the issues raised in Defendants' Motion to Dismiss or the impact of the Amended Complaint upon the Court's subject matter jurisdiction.

In any case, this Court would still possess the authority to issue preliminary relief to preserve the status quo. "It is well settled that while a court is deciding whether it has jurisdiction, it has the authority to issue orders to preserve the status quo, and such order 'must be obeyed by the parties until it is reversed by orderly and proper proceedings.'" *Lundahl v. Halabi*, 600 F. App'x 596, 605 (10th Cir. 2014) (quoting *United States v. United Mine Workers*, 330 U.S. 258, 293 (1947)) (further citation omitted). In *Smotherman v. United States*, for example, the Tenth Circuit held that litigants were bound by a temporary restraining order issued to "maintain [the] status quo" until the district court could assess its jurisdiction. 186 F.2d 676, 677–78 (10th Cir. 1950). The *Smotherman* court observed that even if the relevant statutory jurisdiction-stripping provision[5] applied, such that the district court's injunction was invalid, the "appellants would still be subject to [criminal] contempt for violation of an 'outstanding and unreversed' order of the court." *Id.* (quoting *United Mine Workers*, 330 U.S. at 295).

The Court thus proceeds to consider the instant Motion for TRO.

## II.   Claim Nine

With respect to Claim Nine, the Motion represents that Defendants' upcoming termination of the Management Agreements is "untimely and ineffective as a matter of contract." [Doc. 5 at 13]. Plaintiffs represent that Defendants "insist[] on withdrawing" as property managers on December 9, 2025. [*Id.*]. But because the notices of termination were not received until October 13, 2025, the "earliest effective termination date is . . .

---

[5] Both *Smotherman* and *United Mine Workers* involved the Norris LaGuardia Act. The Supreme Court explained in *United Mine Workers* that the Act "divested the federal courts of jurisdiction to issue injunctions" in certain labor disputes. 330 U.S. at 270–71 & n.19; *see also* 29 U.S.C. §§ 101, 107.

7

December 12, 2025"—60 days after receipt. [*Id.*]. In Plaintiffs' view, "[b]y refusing to produce required records and refusing to maintain financial stability while simultaneously insisting on an accelerated termination date, Defendants have made a compliant transition impossible and violated both the letter and purpose of the Agreements." [*Id.*].

But Defendants do not insist on their withdrawal on December 9, 2025. In their Response, Defendants assert that the Management Agreements terminate "effective December 12, 2025 at the latest" and that "Defendants have every intention of staying on as property manager through that date." [Doc. 20 at 12 (emphasis omitted)]. This position was confirmed by defense counsel during the hearing. [Hearing Tr. 5:19–6:2]. At the hearing, Plaintiffs' counsel conceded that because Defendants no longer insist on a December 9 termination date, the Motion is moot as to Claim Nine. [*Id.* at 6:3–13]. Accordingly, the Motion is respectfully **DENIED as moot** as to Claim Nine.

## III.   Claim Eight

Plaintiffs seek two categories of preliminary relief as to Claim Eight. First, they seek a declaration that the Management Agreements require Defendants to produce certain documents. Second, they contend that because Defendants failed to timely produce the required documents, Defendants should be required to remain as property managers for 60 days from the date that Defendants complete production of the required documents. *See* [*id.* at 43:10–20, 78:1–79:18].

### A.   Whether the Requested Injunction is Disfavored

Before addressing the preliminary injunction factors, the Court considers whether the requested relief falls within any of the categories of "disfavored" preliminary injunctions. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005). Those

categories are "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Id.* (quotation omitted). If the requested injunction falls into one of these categories, the movant must "make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016) (cleaned up).

Defendants do not argue that requiring them to disclose certain documents or remain as property managers beyond December 12 would constitute one of these types of relief. *See* [Doc. 20]. Nor does the Court find that that any categories of disfavored injunctions apply here. Neither of the requested forms of relief would alter the status quo—Defendants are currently acting as property managers and working to disclose all required documents. [*Id*. at 5–8]. Similarly, then, the requested relief is not a "mandatory" injunction because it does not "require[] defendants to do something they were not doing during the most recent peaceable status quo—that is, the last uncontested period preceding the injunction." *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1255 (10th Cir. 2024). And the requested relief would not grant Plaintiffs all the relief they could obtain at trial, because they only seek preliminary relief as to two declaratory judgment claims. *See City of Albuquerque v. Barr*, 515 F. Supp. 3d 1163, 1173–74 (D.N.M. 2021) (finding preliminary injunction was not disfavored when plaintiff's motion for preliminary injunction did not include declaratory relief that could be obtained at trial). Among other things, the Amended Complaint seeks various categories of monetary damages that could be awarded at trial but are irrelevant to the Motion. [Doc. 30 at 41]; *cf. Prairie Band*

9

*Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1248 (10th Cir. 2001) ("The only reason to disfavor a preliminary injunction that grants substantially all the relief sought is if it would render a trial on the merits largely or completely meaningless." (quotation omitted)).

Because the requested preliminary relief is not disfavored, the Court assesses the preliminary injunction factors without requiring Plaintiffs to meet a heightened burden.[6]

### B. Likelihood of Success on the Merits

With respect to the first form of requested relief—that Defendants be required to produce documents that are required under the Management Agreements—the Court finds that Plaintiffs have established a likelihood of success on the merits. Defendants do not dispute that the Management Agreements require them to produce financial reports, accounts payable reports, underlying invoices, rental rolls, and eviction tracking information to Plaintiffs. [Doc. 20 at 12–13]. Rather, they suggest that all relevant documents have been disclosed. [*Id.*; Doc. 20-5]. But Ms. Kunis's testimony was unequivocal that certain documents have not yet been produced. *See supra* at 3–4. The Court concludes based on the record before it, including the plain language of the Management Agreements and Ms. Kunis's testimony, that Plaintiffs are likely to succeed on the merits of their claim that Defendants are required to produce these documents pursuant to the Management Agreements and certain documents remain outstanding. [Doc. 5 at 14–17]; *see also* [Doc. 5-2 at §§ 2.3, 3.5].

As for the second form of requested relief—that the Court order Defendants to remain as property managers until 60 days after the date that document productions are

---

[6] Even if a heightened burden applied, the Court would still conclude that Plaintiffs are entitled to the relatively narrow relief granted in this Order—i.e., that Defendants must produce the documents required by the Management Agreements. *See infra* at 18–19.

10

complete—the Court reaches a different conclusion. Because the success-on-the-merits factor requires a plaintiff to show that "he will probably prevail when the merits are tried," this factor establishes a "relation between temporary and permanent relief." *Penn v. San Juan Hosp., Inc.*, 528 F.2d 1181, 1185 (10th Cir. 1975); *see also Hicks v. Jones*, 332 F. App'x 505, 508 (10th Cir. 2009) (observing that a preliminary injunction grants "intermediate relief of the same character as that which may be granted finally" (quoting *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945))). To demonstrate a likelihood of success on the merits, a plaintiff must "present a prima facie case showing a reasonable probability that [it] will ultimately be entitled to the relief sought." *Salt Lake Trib. Publ'g Co. v. AT&T Corp.*, 320 F.3d 1081, 1100 (10th Cir. 2003) (cleaned up).

Plaintiffs argue that an order requiring Defendants to remain as property managers beyond December 12, 2025 is necessary to ensure Plaintiffs the benefit of their bargain as to the 60-day notice period. [Hearing Tr. at 78:16–79:18]. Ms. Kunis testified that the Management Agreements include a 60-day notice period before termination because it generally takes 60 days to secure a replacement property management company. [*Id.* at 40:9–23]. Thus, the 60-day period is intended to provide a buffer for Plaintiffs to hire a replacement property management company before Defendants cease management operations. [*Id.*]. But because securing a new property manager is effectively impossible without the missing documents, Plaintiffs contend that Defendants' failure to provide all required documentation has deprived Plaintiffs of the benefit of their bargain.

The problem with this argument, as Plaintiffs' counsel conceded, is that the Management Agreements do not "link" the document production requirements to the termination provisions. [*Id.* at 79:19–80:11]. Rather, the termination provision merely

11

states that the Agreements "may be terminated by either party without cause effective by written notice delivered to the other party at least sixty (60) days prior to the date of termination." [Doc. 5-2 at § 5.1]. So long as notice is "timely given," the Agreements "shall terminate on the date provided in such termination notice." [*Id.*]; *see also* [*id.* at § 8.3]. By their plain language, the Management Agreements impose no conditions precedent to termination other than proper notice. Nor do Plaintiffs point to any other provision in the Management Agreements that even suggests that the 60-day termination period is stayed pending the disclosure of documents necessary for a smooth transition of management responsibilities.

Plaintiffs do not suggest that these provisions are ambiguous (nor does the Court find them to be), and the Parties agree that under the termination and notice provisions, the current termination date is December 12, 2025. [Doc. 5 at 13; Doc. 20 at 12; Doc.5-5 at 2]. To the extent Plaintiffs seek this relief as a matter of contract interpretation, the Court finds they have failed to establish a reasonable probability that they would be entitled to such relief. *See Randall & Blake, Inc. v. Metro Wastewater Reclamation Dist.*, 77 P.3d 804, 806 (Colo. App. 2003) ("Courts possess no authority to rewrite contracts and must enforce unambiguous contracts in accordance with their terms.").[7]

Defendants argue that Plaintiffs' request that Defendants continue performing their contractual obligations essentially amounts to equitable reformation of the Management Agreements. [Hearing Tr. 82:11–19]. This Court respectfully agrees. Under Colorado

---

[7] For purposes of this Order, the Court assumes that Colorado law controls Plaintiffs' contract claims. The Management Agreements contain choice-of-law provisions selecting Colorado law as governing their terms. [Doc. 5-2 at § 8.8; Doc. 5-3 at § 8.8]. Neither Party has suggested that any other state's law should control.

12

law, courts may grant reformation "if the evidence clearly and unequivocally shows that an instrument does not express the true intent or agreement of the parties." *Affordable Country Homes, LLC v. Smith*, 194 P.3d 511, 515 (Colo. App. 2008). "Reformation is permissible when there was a mutual mistake or one party made a unilateral mistake and the other party engaged in fraud or inequitable conduct." *Id.* Without more, a failure to adequately inspect the contract before signing, or a failure to "consider thoroughly whether the agreement completely protected [a party's] interests," is not grounds for reformation. *Poly Trucking, Inc. v. Concentra Health Servs., Inc.*, 93 P.3d 561, 565 (Colo. App. 2004).

Based on the record before it, the Court finds that Plaintiffs have not established a reasonable probability that they would be entitled to equitable reformation of the Management Agreements if this case were tried on its merits. Ms. Kunis testified that, as a practical matter, the 60-day notice period functions as a buffer for a property owner to obtain a new management company before the previous agreement terminates. [Hearing Tr. at 40:9–23]. But she did not testify that the Parties intended the document production requirements to be a prerequisite to termination or initiation of the notice period. Nor have Plaintiffs presented other evidence suggesting that the Management Agreements do not reflect the Parties' intentions, or that Defendants engaged in fraudulent or inequitable conduct when the Parties entered the Management Agreements. To the contrary, Ms. Kunis's testimony indicates that she is a sophisticated businessperson who regularly negotiates and enters into contracts like the Management Agreements. [*Id.* at 47:9–48:14]. Put simply, she was capable of negotiating a contract provision to link the termination and notice provisions with the document production requirements but failed

13

to do so. *See Poly Trucking, Inc.*, 93 P.3d at 565. That failure is not a basis for reformation. *Id.*

The Court concludes Plaintiffs have failed to show a reasonable probability that they would ultimately be entitled to the relief sought in this portion of the requested temporary restraining order. Accordingly, the Motion is respectfully **DENIED** to the extent Plaintiffs seek an order requiring Defendants to remain as property managers until 60 days after the date that all required documents are produced. The Court limits its analysis of the remaining temporary injunction factors to Plaintiffs' request that Defendants be required to complete their productions of the required documents.

### C. Irreparable Harm

A showing of probable irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction." *Dominion Video*, 356 F.3d at 1260. "The party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Schrier*, 427 F.3d at 1267 (quotation and brackets omitted). A plaintiff satisfies this requirement by "demonstrating a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quotation omitted). In the business context, "[a] threat to trade or business viability may constitute irreparable harm," especially where waiting until trial to grant relief would leave the plaintiff with an "empty victory." *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986); *see also Stouder v. M & A Tech., Inc.*, No. 09-cv-04113-JAR-KGS, 2010 WL 2044666, at *10 (D. Kan. May 24, 2010) ("Loss of customers, loss of goodwill, and threats

14

to a business' viability can constitute irreparable harm." (quotation omitted)); *Zzyym v. Pompeo*, No. 15-cv-02362-RBJ, 2019 WL 764577, at *2 (D. Colo. Feb. 21, 2019) (observing that even an economic loss may be irreparable if the loss would cause the movant "harm as an entity, for example by impairing its ability to perform its core functions").

The Court finds that Plaintiffs have established a sufficient likelihood of irreparable harm based on Ms. Kunis's testimony that Defendants' failure to produce the required documents prevents her from hiring a replacement property management company. Ms. Kunis repeatedly testified that the prospective management companies she has met with are unwilling to commit to managing the Properties without updated financial information. *See, e.g.*, [Hearing Tr. at 18:19–25, 23:19–24:23 (explaining why accurate reporting of accounts payable and underlying invoices is essential to hiring a new property manager); *id.* at 29:24–30:8 (same as to rent rolls); *id.* at 30:11–31:8 (same as to eviction tracking information); *id.* at 34:19–35:17 (same as to financial information and underlying invoices)]. For instance, she testified that "it is entirely impossible for a new management company to agree to take on management of properties without [knowing] what bills are outstanding to others." [*Id.* at 24:7–10]; *see also* [Doc. 5-1 at ¶ 13 (asserting that "[e]ach prospective management company" told Ms. Kunis they cannot assume management without the missing documents)]. Although Defendants argue that they have satisfied their disclosure obligations, they do not dispute Ms. Kunis's assertions that the documents at issue are essential to transitioning the Properties to a replacement management company. *See* [Doc. 20 at 8, 12–13; Doc. 20-2 at ¶ 19; Doc. 20-5].

Ms. Kunis also testified that Plaintiffs will be unable to operate the Properties if she cannot transition the Properties to a replacement management company. Without a management company in place, the Properties cannot function—all maintenance, rent collection, and emergency operations would cease. [Hearing Tr. at 41:25–42:20]. Moreover, without a management company or updated vendor lists, Plaintiffs will be unable to "interface" with the vendors that provide utility and maintenance services at the Properties. [*Id.* at 42:21–43:5]. Ms. Kunis asserted that both the mortgages on the Properties through Fannie Mae and relevant HUD regulations require the Properties to have a management company. [*Id.* at 43:25–44:25]. Thus, if she is unable to secure a replacement management company, Ms. Kunis (and by extension Plaintiffs) could lose the Properties or her ability to do business with HUD in the future. [*Id.*]. Such an outcome would put Plaintiffs out of business. [*Id.* at 44:12–19]. In short, if Defendants do not provide the documents required to transition the Properties to a replacement management company, Plaintiffs will be unable to perform core business functions and will face an existential threat to their business. The Court finds that these harms are irreparable and cannot be compensated after the fact with money damages.

### D. Balance of Equities and Public Interest

Finally, the Court finds that both the balance of equities and public interest favor a temporary restraining order requiring Defendants to produce documents required by the Management Agreements. With respect to the balance of equities, the Court observes that the burden imposed on Defendants by such an injunction would be slight. Defendants do not dispute that the Management Agreements require the disclosures, and they are already working to produce the relevant documents. [Doc. 20 at 12–13; Doc.

16

20-5]. This factor may also be used to account for the interests of third parties.[8] *Freshpack Produce, Inc. v. VM Wellington LLC*, No. 12-cv-03157-WJM-MJW, 2013 WL 50433, at *5 (D. Colo. Jan. 3, 2013) (citing *Ayres v. City of Chicago*, 125 F.3d 1010, 1013 (7th Cir.1997) (Posner, C.J.)). And the interests of the relevant third parties here—the tenants at the Properties—strongly favor an injunction requiring production of the documents required to secure a replacement management company at the Properties. Without a management company, the tenants would be deprived of maintenance and other services. [Hearing Tr. at 41:25–42:12]. As for the public interest, the Court agrees with Plaintiffs that the public interest favors enforcement of valid contracts. [Doc. 5 at 21]; *SizeWise Rentals, Inc. v. Mediq/PRN LifeSupport Servs., Inc.*, 87 F. Supp. 2d 1194, 1200 (D. Kan. 2000) *aff'd*, 216 F.3d 1088 (10th Cir. 2000).

Because Plaintiffs have satisfied all four factors for issuance of a temporary restraining order, the Motion is respectfully **GRANTED** insofar as Plaintiffs request a

---

[8] Plaintiffs characterize the impact of the lapse in management services to the tenants as irreparable harm. *See, e.g.*, [Doc. 5 at 17 ("The most urgent and compelling basis for irreparable harm is the immediate threat to the health and safety of the residents who live in the Apartment Communities—properties that serve low-income households, families with children, elderly residents, and other vulnerable tenants.")]. This Court, in no way, minimizes the potential adverse impact upon the residents. But the tenants are not plaintiffs in this action, and therefore, any irreparable harm to them is not attributable to Plaintiffs, and is more properly considered as part of the balance of the equities. *See, e.g.*, *Am. Dairy Queen Corp. v. Brown-Port Co.*, 621 F.2d 255, 259 n.4 (7th Cir. 1980) ("[T]he 'no adequate remedy at law/irreparable injury' prerequisite is not satisfied by the harm that may befall a nonparty."); *Great Lakes Higher Educ. Corp. v. Cavazos*, 698 F. Supp. 1464, 1475 (W.D. Wis. 1988) ("[T]he burden that would be imposed on students by an increase in the fee does not constitute the irreparable injury necessary to entitle plaintiff to a preliminary injunction; that prerequisite is not satisfied by harm to a third party."); *Nutrition Distrib., LLC v. Enhanced Athlete, Inc.*, No. 2:17-cv-02069-JAM-CKD, 2017 WL 5467252, at *2 (E.D. Cal. Nov. 14, 2017) (declining to consider harm to third parties in irreparable harm analysis); *Netchoice v. Skrmetti*, No. 3:24-cv-01191, 2025 WL 1710228, at *9 (M.D. Tenn. June 18, 2025) ("[I]rreparable injury to a non-party cannot satisfy the irreparable-injury requirement for a preliminary injunction.").

temporary restraining order requiring Defendants to produce the documents required by the Management Agreements.

## CONCLUSION

For the reasons set forth above, **IT IS ORDERED** that:

(1) Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction [Doc. 5] is **GRANTED in part** and **DENIED in part** to the extent the Motion seeks a temporary restraining order;

(2) To the extent Plaintiffs seek a temporary restraining order as to Claim Nine in their Complaint, the Motion is **DENIED as moot**;

(3) The Motion is **DENIED** as to Plaintiffs' request for a temporary restraining order requiring Defendants to continue as property managers until 60 days after all required documents are produced;

(4) The Motion is **GRANTED** as to Plaintiffs' request for a temporary restraining order requiring Defendants to produce certain categories of documents required by the Management Agreements;

(5) No later than December 8, 2025, Defendants are **ORDERED** to produce the following documents to Plaintiffs: (a) invoices underlying Defendants' final financial reports for September 2025; (b) a final financial report for October 2025 for the property owned by Pueblo; (c) invoices underlying Defendants' final financial reports for October 2025; (d) an updated accounts payable report that reflects all unpaid vendor invoices; (e) eviction tracking information describing Defendants' efforts to evict the "top 20 to 25" tenants with the highest delinquent amounts; and (f) accurate rent rolls for

18

November for the property owned by Pueblo;

(6) The portion of the Motion that requests a preliminary injunction remains pending. No later than December 16, 2025, the Parties shall **MEET and CONFER** and **FILE** a Joint Status Report regarding whether further consideration of a preliminary injunction is necessary in light of this Order; and

(7) Defendants' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1) [Doc. 17] is **DENIED as moot**.

DATED: December 4, 2025                BY THE COURT:

_____
Nina Y. Wang
United States District Judge